**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, SIERRA CLUB, WILLITS ENVIRONMENTAL CENTER, and ENVIRONMENTAL PROTECTION INFORMATION CENTER,<br><br>    Plaintiffs,<br><br>CALIFORNIA FARM BUREAU FEDERATION,<br><br>    Plaintiff-Intervenor<br>v.<br><br>CALIFORNIA DEPARTMENT OF TRANSPORTATION, MALCOLM DOUGHERTY, in his official capacity as Director of the California Department of Transportation, and U.S. ARMY CORPS OF ENGINEERS,<br><br>    Defendants.<br>_____/ | No. C 12-02172 JSW<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

**INTRODUCTION**

This matter comes before the Court upon consideration of the motion for a preliminary injunction filed by the Center for Biological Diversity ("Center"), the Sierra Club, and the Environmental Protection Information Center ("EPIC") (collectively the "Moving Plaintiffs"). The Court has considered the parties' papers, including the brief filed by Intervenor Plaintiff, California Farm Bureau Federation ("Farm Bureau"), and the sur-reply filed by Defendants California Department of Transportation and Malcolm Dougherty (collectively "Caltrans"),

relevant legal authority, the record in this case, and it has had the benefit of oral argument. For the reasons set forth in the remainder of this Order, the Court HEREBY DENIES the Moving Plaintiffs' motion.

**BACKGROUND**

This litigation arises out of a highway project around the community of Willits, California (the "Willits Bypass Project").[1] The stated purpose of and need for the Willits Bypass Project is "to reduce delays, improve safety, and achieve a 'C' Level of Service (LOS – a qualitative means of describing traffic conditions...) for interregional traffic on US 101," around the City of Willits. (Docket No. 54, Declaration of Aruna Prabhala ("Prabhala Decl."), ¶ 3, Ex. 1 (Excerpts of Draft Environmental Impact Statement ("Draft EIS"), at S-1); Docket No., 61-1, Declaration of Kari E. Fisher ("Fisher Decl."), Ex. 2 (Excerpts of Final Environmental Impact Statement ("Final EIS") at 1-3).)

Caltrans and the Federal Highway Administration ("FHWA")[2] issued a Draft EIS in 2002, and a Final EIS in October 2006. In each of those documents, Caltrans considered variations of a four-lane freeway and a no-build alternative. (*See, e.g.,* Docket No. 21, First Amended Complaint ("FAC") ¶¶ 27-28; Prabhala Decl., Ex. 1 (Draft EIS at S-2); Fisher Decl., Ex. 2 (Final EIS at Appendix G at 1-1).) The Draft EIS contains a summary of possible controversial issues, which includes a discussion of a two-lane bypass. (Prabhala Decl., Ex. 1 (Draft EIS at S-6).) In that section of the Draft EIS, Caltrans states:

> FHWA regulations do not allow development of a facility that would be functionally obsolete within its design life. In 1992, Caltrans staff studied a two-lane bypass of Willits and determined that a two-lane bypass would not achieve a satisfactory level of service or improve safety. In 2000, after all technical studies were completed for the current range of alternatives, Willits Environmental Center (WEC) asked Caltrans to reconsider a two-lane alternative for the proposed bypass project. In response, Caltrans analyzed the concept but chose not to add a two-lane alternative because, foremost, a two-lane alternative would not meet the "purpose and need" for the project. The "purpose and need" calls for a facility that would provide a LOS "C" through the 20-year design period (i.e., 2028). A two-lane

---

[1] The Willits Bypass Project dates back to the mid-1950s. (*See* www.dot.ca.gov/dist1/d1projects/willits/background.htm (last visited Oct. 31, 2012).)

[2] The Court granted the FHWA's motion to dismiss, with prejudice, on September 11, 2012.

2

United States District Court
For the Northern District of California

> facility would provide a LOS "D" at peak hour upon construction (2008), and would diminish to LOS "E" within the 20-year period. LOS "E" exists when a facility is at capacity during peak traffic flows. Thus, a new two-lane highway would be functionally obsolete within the design period. This issue is discussed in detail in Section 3.6.2.[3]

(Prabhala Decl., Ex. 1 (Draft EIS at S-6 (footnotes omitted); *see also* Docket No. 63, Declaration of David G. Kelley ("Kelley Decl."), ¶ 7); Docket No. 49, Declaration of Richard Estabrook ("Estabrook Decl."), ¶15, Ex. 1 (Draft EIS at 3-33 and 3-34).)[4] Caltrans also noted that "[i]t is important to recognize that a LOS of 'C' on a four-lane highway is substantially different than LOS 'C' on a two-lane highway, in that a freeway offers continuous passing opportunities. On a 2-lane road, passing opportunities are affected by volume and sight distance. Average operating speeds are directly affected by slower traffic." (Prabhala Decl., Ex. 1 (Draft EIS at S-6 n.2).)

Caltrans ultimately determined that the build alternative designated as "Modified Alternative J1T" was the Least Environmentally Damaging Practicable Alternative. (Prabhala Decl., ¶ 3, Ex. 4 (Final EIS at 1-4).) Caltrans also stated that, "[i]f the project were given environmental approval, and funding were appropriated, [Caltrans] could design and construct all or part of the proposed project depending on funding availability. In an effort to balance potential funding limitations and the need for the project, the Willits Bypass could be constructed in phases." (*Id.*) In December 2006, Caltrans signed a Record of Decision ("ROD") for the Willits Bypass Project, approving Modified Alternative J1T. (FAC ¶ 29; Fisher Decl., Ex. 5.) The Moving Plaintiffs did not file a legal challenge to that decision.[5]

In 2007, "funding constraints did result in a decision to phase the project." (Kelley Decl., ¶ 23.) There also have been a number of design changes to the Willits Bypass Project,

---

[3] Section 3.6.2 of the Draft EIS is not part of the current record.

[4] Mr. Kelley has been the Project Manager for the Willits Bypass Project for four years and, prior to taking on that role, was the Willits Bypass Project's Design Engineer for six years. (Kelley Decl., ¶ 1.)

[5] WEC also is a named plaintiff in this case. However, it does not join in the NEPA claim, because of a prior agreement with Caltrans. (*See* Docket No. 67, Declaration of Ardine Zazzeron ("Zazzeron Decl."), ¶ 4, Ex. C.) It is undisputed that WEC has been a member of the Willits Bypass Project's Technical Advisory Group since 1990.

3

and Caltrans prepared a re-evaluation in 2010 to examine those changes and their potential impacts. Caltrans prepared a further re-evaluation in 2011, to evaluate impacts on Bakers Meadowfoam and farmlands. (*See* Kelley Decl., ¶¶ 15-22; Docket No. 53, Declaration of Ellen Drell ("Drell Decl."), ¶ 13, Ex. 8 (NEPA/CEQA Re-evaluation Form dated June 17, 2010 ("2010 Re-Evaluation"), Ex. 9 (NEPA/CEQA Re-evaluation Form dated December 27, 2011 ("2011 Re-Evaluation").)[6]

In the 2010 Re-Evaluation, Caltrans stated that due to "funding constraints, the bypass will be constructed in two phases: a functional interim two-lane facility constructed initially and, when adequate funding becomes available in the future, the remaining lanes will be constructed to complete the four-lane bypass." (2010 Re-evaluation at 3; *see also id.* at 4-5, 10; 2011 Re-evaluation at 3 (noting phased construction).) Caltrans concluded that the changes discussed in the Re-Evaluation forms did not require it to issue a supplemental EIS, although it did prepare a supplemental EIS in May 2010 to address impacts on North Coast Semaphore Grass. (2010 Re-Evaluation at 1; 2011 Re-Evaluation at 1; Zazzeron Decl., Ex. B.)

On August 31, 2012, Caltrans approved the construction contract for Willits Bypass Project. (Kelley Decl., ¶ 8.) The Moving Plaintiffs contend that Caltrans failed to comply with the requirements of the National Environmental Policy Act, 42 U.S.C. Sections 4321, *et seq.* ("NEPA"), because it failed to prepare a supplemental EIS that evaluates a two-lane alternative for the Willits Bypass Project. The Moving Plaintiffs bring claims against Caltrans under NEPA and the Administrative Procedure Act, 5 U.S.C. Section 701, *et. seq.* ("APA").[7]

---

[6] Ms. Drell has lived east of Willits since 1975, is a WEC Board member, participated in public meetings relating to the Willits Bypass Project since 1988, and served as a citizen representative on Caltrans' Technical Advisory Group. (*See* Drell Decl., ¶¶ 1, 3-5; Docket No. 67, Declaration of Ardine Zazzeron ("Zazzeron Decl."), ¶ 4, Ex. C.)

[7] Plaintiffs also assert a claim against the Army Corps of Engineers (the "Corps") for violations of Section 404 of the Clean Water Act ("CWA"). 33 U.S.C. § 1344. At the hearing, the Moving Plaintiffs confirmed that they are not moving for injunctive relief on the CWA claim. In February 2012, the Corps issued a Permit Evaluation and Decision Document, in which it also evaluated information and circumstances that have developed after Caltrans issued the Final EIS and ROD. The Corps determined that a supplemental environmental assessment ("EA"), rather than a supplemental EIS, was appropriate, because "the new information presented did not rise to the level of significant impact on the human environment." (Docket No. 69-1, Declaration of Martha C. Mann ("Mann Decl."), ¶ 3, Ex. 1

4

The Court shall address specific additional facts as needed in the analysis.

## ANALYSIS

**A.     Evidentiary Issues.**

**1.     The Court sustains, in part, the objections to the Estabrook Declaration.**

The Moving Plaintiffs allege that "multiple years of actual traffic volume data ... is substantially lower than the traffic volume projections relied upon in the" Final EIS, and they allege this requires consideration of a two-lane alternative for the Willits Bypass Project. (*See* FAC ¶ 50.) To support this argument in their motion, the Moving Plaintiffs submit a declaration from Richard Estabrook. Caltrans contends that Mr. Estabrook is "an unqualified lay person with no expertise in traffic analysis or data whatsoever." (Docket No. 62, Caltrans Opp. Br. at 13:10-15.) Caltrans objects to his testimony, and paragraph 11 in particular, under Federal Rule of Evidence 702.

The Moving Plaintiffs respond that Mr. Estabrook "is not being offered as an expert in traffic modeling but rather to authenticate relevant data he has collected from Defendants regarding traffic use of the Willits area and to provide his calculations based on this data." (Docket No. 72, Reply Br. at 10:16-19.) Mr. Estabrook also attests that he has a Bachelor of Science in Petroleum Engineering and that, in 1998, in response to the development of the Willits Bypass Project, he began to study "traffic engineering and developed a theoretical and working knowledge of the concept and calculation of" Level of Service. (Estabrook Decl., ¶¶ 2-3.)

The majority of Mr. Estabrook's declaration recites data taken from documents prepared by Caltrans. On that basis, the Court overrules Caltrans' objections to paragraphs 1-10, and 12. With respect to paragraph 11, Caltrans submits a declaration from Troy Arseneau, who attests that "data included in ... traffic volume data books," on which Mr. Estabrook relied, "are intended to represent estimated values, and therefore do not include requisite data to be used as a sole source for traffic operational analysis or Growth Factor projections, without incorporating more detailed data from other sources." (Docket No. 66, Declaration of Troy at 009576.)

5

Arseneau ("Arseneau Decl."), ¶ 7.)[8] The Court finds that Caltrans' objections go to the weight, rather than the admissibility, of Mr. Estabrook's testimony, and overrules Caltrans' objections to paragraph 11. The Court sustains the objections to paragraphs 13 and 14, because those paragraphs do not simply authenticate the data on which Mr. Estabrook relies.[9]

### 2. The Court sustains, in part, the objections to the Drell Declaration.

In support of their argument regarding irreparable harm, the Moving Plaintiffs argue that once construction starts, the contractor will cut trees and vegetation. The Moving Plaintiffs submit a declaration from Ellen Drell to support this argument. Caltrans object to Ms. Drell's testimony under Rule 702, on the basis that she is not qualified to give opinions about tree characteristics, such as age or status, *e.g.,* heritage. The Moving Plaintiffs again respond that they do not proffer Ms. Drell as an expert on botany or dendrology and assert that she is relying on her experience as a resident of the area surrounding the Willits Bypass Project.

To the extent Ms. Drell offers opinions about the specific age of particular trees and whether they are "heritage" status, the Court sustains Caltrans' objections. Although Ms. Drell attests that she has studied and observed the flora and fauna of the area around the Willits Bypass Project and has participated in meetings about the project development, she does not explain how she knows the particular age or status of the trees at issue. To the extent Caltrans objects to paragraphs 10 and 11 of Ms. Drell's declaration, there is other evidence in the record that addresses those issues, to which Caltrans has not objected. Therefore, the Court has not relied on those paragraphs, and it overrules those objections as moot.

### B. Legal Standards Applicable to a Motion for Preliminary Injunction.

In order to obtain a preliminary injunction, plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in

---

[8] Mr. Arseneau is a Senior Transportation Engineer for Caltrans, and is Chief of the Office of Traffic Operations, District 1 and District Traffice Manager and District Transportation Management Plan Manager. (Arseneau Decl., ¶ 1.)

[9] The Court expresses no opinion on whether Mr. Estabrook would be permitted to testify on matters relating to traffic growth factors.

United States District Court
For the Northern District of California

the public interest." *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008) (citations omitted). The *Winter* court also noted that because injunctive relief is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*)). Thus, "[i]n each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id.* at 24 (citing *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987)). "'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Id.* (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

The Ninth Circuit has stated its "serious questions" sliding scale approach survives *Winter*, whereby a court may grant preliminary injunctive relief if a plaintiff demonstrates "that serious questions going to the merits were raised and the balance of the hardships tips sharply in the plaintiff's favor." *Alliance For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (quoting *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) ("*Lands Council*"), *overruled on other grounds by Winter*, 555 U.S. at 22) (hereinafter "*Cottrell*").

> [F]or the purposes of injunctive relief, "serious questions" refers to questions which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo. Serious questions are "substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir.1952) (Frank, J.). Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a "fair chance of success on the merits." *National Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir.1985) (Duniway, J.).

*Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988). Whether a plaintiff establishes a likelihood of success on the merits or establishes serious questions going to the merits, that plaintiff still must show the likelihood of irreparable harm and that the public interest favors an injunction. *Cotrell*, 632 F.3d at 1135.

7

### C. NEPA Requirements.

NEPA "establishes a 'national policy [to] encourage productive and enjoyable harmony between man and his environment,' and was intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States." *Department of Transportation v. Public Citizen*, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321) (hereinafter "*Public Citizen*"). NEPA does not mandate particular results. Rather "it imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Id.* (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-51 (1989)); *see also Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) ("*Blue Mountains*") ("NEPA ensures that the agency ... will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience.") (internal quotation marks and citation omitted).

NEPA requires federal agencies to prepare a detailed EIS for all "major Federal actions significantly affecting the quality of the human environment." *Blue Mountains*, 161 F.3d at 1211-12 (quoting 42 U.S.C. § 4332(2)(C)). "NEPA also imposes a continuing duty to supplement previous environmental documents." *Price Road Neighborhood Ass'n v. United States Dep't of Transportation*, 113 F.3d 1505, 1509 (9th Cir. 1997)) (hereinafter "*Price Road*"). "[T]he decision whether to prepare a supplemental EIS is similar to the decision to prepare an EIS in the first instance: if there remains major Federal action to occur, and if ... new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 374 (1989) (internal quotations and brackets omitted).

Under regulations promulgated by the FHWA, an supplemental EIS is required where "changes to the proposed action would result in significant environmental impacts that were not evaluated in the EIS; or new information or circumstances relevant to environmental concerns

8

1 and bearing on the proposed action or its impacts would result in significant environmental
2 impacts not evaluated in the EIS." 23 C.F.R. § 771.130(a)(1)-(2).[10] "Where the Administration
3 is uncertain of the significance of the new impacts, the applicant will develop appropriate
4 environmental studies or, if the Administrations deems appropriate, an EA to assess the impacts
5 of the changes, new information, or new circumstances." 23 C.F.R. § 771.130(c).

6 The FHWA regulations also provide for reevaluation of environmental documents. 23
7 C.F.R. § 771.129. Those regulations provide, in relevant part, that "[a]fter approval of the
8 ROD, ... the applicant shall consult with the Administration prior to requesting any major
9 federal approvals or grants to establish whether or not the approved environmental document
10 ...remains valid for the requested Administration action." *Id.* § 771.129(c). In addition, the
11 FHWA regulations provide that "a supplemental EIS will not be necessary where: (1) the
12 changes to the proposed action, new information, or new circumstances result in a lessening of
13 adverse environmental impacts evaluated in the EIS without causing other environmental
14 impacts that are significant and were not evaluated in the EIS...." *Id.* § 771.130(b)(1).

15 The regulations promulgated by the CEQ, in turn, guide a court's review of an agency's
16 determination of "significance," and include two components: context and intensity. *Blue*
17 *Mountains*, 161 F.3d at 1212; *see also Ocean Advocates v. U.S. Army Corps of Engineers*, 402
18 F.3d 846, 865 (9th Cir. 2005) (citing 40 C.F.R. § 1508.27). "Context refers to the setting in
19 which the proposed action takes place." *Id.*; *see also* 40 C.F.R. § 1508.27(a) ("the significance
20 of an action must be analyzed in several contexts, such as society as a whole (human, national),
21 the affected region, the affected interests and the locality"). "Intensity means 'the severity of
22 the impact.'" *Ocean Advocates*, 402 F.3d at 865 (quoting 40 C.F.R. § 1508.27(b)). Some of the
23 factors a court may consider to determine "intensity" are:

---

[10] This regulation is similar to regulations promulgated by the Council on Environmental Quality ("CEQ"), which require an agency to prepare a supplemental EIS when it "makes substantial changes in the proposed action that are relevant to environmental concerns; or ... [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" 40 C.F.R. § 1502.9(c)(1)(i)-(ii)

9

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
...

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27(b).

**D.  Laches.**

Caltrans argues that the Moving Plaintiffs cannot establish a likelihood of success on the merits of their NEPA claim, because it is barred by laches. "Because environmental damage does not inflict harm only on the plaintiff, laches is strongly disfavored in environmental cases," and generally should be used in such cases only to "avoid defeat of Congress' environmental policy." *Save the Peaks Coalition v. United States Forest Service*, 669 F.3d 1025, 1031 (9th Cir. 2012) (internal quotations and citations omitted). In order to prevail on a laches defense, Caltrans will be required to show that the Moving Plaintiffs lacked diligence in pursuing the NEPA claim and that it suffered prejudice as a result of the Moving Plaintiffs' lack of diligence. *Id.*; *see also Neighbors of Cuddy Mountain v. United States Forest Service*, 137 F.3d 1372, 1381 (9th 1998).

"Prejudice in environmental actions is measured by what Congress defines as prejudice. The primary concern is whether the harm that Congress sought to prevent ... irreversible." *Id.* (quotations and citations omitted). Two relevant factors for courts to consider in evaluating whether a defendant has been prejudiced by a plaintiff's lack of diligence are "the money spent on a project and the extent to which a project has progressed so far that 'the harm [plaintiffs] fear' has already occurred." *Neighbors of Cuddy Mountain*, 137 F.3d at 1382 (quoting *Apache Survival Coal. v. United States*, 21 F.3d 895, 912-13 (9th Cir. 1994)).

In the *Save the Peaks* case, the court concluded, albeit reluctantly, that the defendant had not shown the requisite prejudice because it had not started construction on the challenged project.[11] Thus, "harm to the environment was not irreversible," and the harm the plaintiffs feared had not yet occurred. *Id.* at 1033. The court also rejected the defendant's argument that its economic losses, and the increased costs it faced because of the plaintiffs' delay in filing suit was sufficient to establish prejudice. *Id.* at 1034.

The contractor has not yet started construction on the Willits Bypass Project and, thus, the alleged harm to the environment is not yet irreversible. The Court does not prejudge the viability of this defense in the context of a trial on the merits, but the Court concludes that Caltrans has not shown that laches will clearly bar the Moving Plaintiffs' NEPA claim, such that they could not establish either a likelihood of success of the merits or serious questions on that claim. The Court shall, however, consider the Moving Plaintiffs' alleged delay to evaluate whether the balance of the equities tip sharply in their favor.

**E.     The Court Denies the Moving Plaintiffs' Request for a Preliminary Injunction.**

   **1.     Irreparable Harm.**

"Environmental injury, by its nature, can seldom be adequately remedied by money damages, and is often permanent or at least of long duration, *i.e.* irreparable." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). The Moving Plaintiffs put forth a number of arguments as to how they will be irreparably harmed if the Court fails to grant their motion. At the time Caltrans filed its opposition, it estimated that construction could begin in late October or mid-November 2012. (*Id.*) At the hearing, Caltrans represented that, because the contractor has not submitted certain required documents, its best estimate is that construction would not begin until at least late November 2012 and might not begin until January 2013. Based on the record, the most imminent of the alleged harms is based on the undisputed fact that the contractor will "top" trees and remove riparian vegetation within the footprint of the Willits Bypass Project. (*See* Declaration of Chris Collison ("Collison Decl."), ¶¶ 5, 8.)

---

[11]     The Ninth Circuit concluded that plaintiffs lack of diligence was egregious. *Id.* at 1034-35.

11

1  The Ninth Circuit has "decline[d] to adopt a rule that *any* potential environmental injury *automatically* merits an injunction, particularly where ... the plaintiffs are not likely to succeed on the merits of their claim." *Lands Council*, 537 F.3d at 1005 (emphasis in original). Assuming for the sake of argument that the Moving Plaintiffs could meet their burden to show a likelihood of irreparable harm, for the reasons discussed below, the Court finds that they fail to meet their burden on the remaining factors.

### 2. Likelihood of Success or Serious Questions.

The Moving Plaintiffs do not contend that Caltrans should not proceed at all on the Willits Bypass Project. Rather, their position is that, in light of purportedly new information and new circumstances, "[r]easonable two-lane alternatives exist," and Caltrans should have prepared a supplemental EIS to evaluate those alternatives. (*See, e.g.,* FAC ¶ 34.)[12] The Moving Plaintiffs argue that the new information and changed circumstances consist of: (1) the decision to proceed in phases; (2) changes in traffic patterns; and (3) revisions to the mitigation and monitoring plan. (*See* FAC ¶ 50.)

In order to prevail on the merits, the Moving Plaintiffs will be required to show that the decision not to prepare a supplemental EIS was arbitrary or capricious. A court "will reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could

---

[12] "An action to compel an agency to prepare a [supplemental EIS] ... is not a challenge to a final agency decision, but rather an action arising under 5 U.S.C. § 706(1), to 'compel agency action unlawfully withheld or unreasonably delayed.'" *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000). The Moving Plaintiffs do not cite Section 706(1) as the basis for judicial review in the FAC. Although the Corps argues that, as a result, they could not prevail on the merits, the Court finds that this argument elevates form over substance. It is evident from the FAC that the Moving Plaintiffs assert that Caltrans "failed to take a *discrete* agency action that it is required to take." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004) (emphasis in original). Moreover, in their prayer for relief, the Moving Plaintiffs ask that the Court "[o]rder ... Caltrans to prepare a Supplemental Environmental Impact Statement that considers two-lane alternatives and otherwise addresses the substantial changes and significant new information since October 2006 before proceeding with the construction of the Willits Bypass." (FAC, Prayer for Relief, ¶ 2.) At the hearing, however, the Moving Plaintiffs asserted that their NEPA claim also challenges the 2011 Re-Validation as a "final agency action" that should be set aside under Section 706(2). That theory of relief is not adequately alleged in the FAC, and the Court has not considered it for purposes of this motion.

12

not be ascribed to a difference in view or the product of agency expertise." *Lands Council*, 537 F.3d at 987.

### a. Phased Construction.

The Moving Plaintiffs' primary argument in support of their NEPA claim is that the decision to phase construction will result in significant environmental impacts that were not evaluated in the Final EIS.[13] This is not a case where Caltrans stood silent once the possibility of phased construction became a reality. Rather, pursuant to the FHWA regulations, it prepared the 2010 Re-Evaluation and concluded that a supplemental EIS was not required. (2010 Re-Evaluation at 1.) Although the Moving Plaintiffs disagree with Caltrans' conclusion, the Court finds they have not met their burden to show there are serious questions that the decision not to prepare a supplemental EIS was arbitrary or capricious.

In reaching this conclusion, the Court finds *Bair v. California Department of Transportation*, 2011 WL 2650896 (N.D. Cal. July 6, 2011) to be instructive. In *Bair*, the plaintiffs moved for preliminary injunction to enjoin a project to widen portions of Highway 101 through Richardson Grove State Park, which was "home to ancient redwoods ... [and] an abundance of wildlife including the marbled murrelet and spotted owl," both endangered species. *Bair*, 2011 WL 2650896, at *1, *7. Caltrans prepared an environmental assessment for the project, made a "finding of no significant impact ("FONSI")," and, therefore, did not prepare an environmental impact statement. In support of their motion for a preliminary injunction, the plaintiffs put forth evidence that Caltrans minimized impacts described by other

---

[13] As Caltrans points out, the concept of phased construction is not a new concept. For example, a Willits Bypass Project Report dated November 2006, Caltrans raised the idea that phased construction might be required to address funding shortfalls. (*See* Docket No. 92; Kelley Decl., ¶ 24.) In addition, although the record only includes excerpts of the Final EIS, the concept and possibility of phased construction was raised in that document as well. (*See, e.g.*, Kelley Decl., ¶ 24, Ex. A (Final EIS at 1-4).) Thus, the Moving Plaintiffs' arguments about phased construction could be construed as an "attempted end run around the statute of limitations" that preclude any challenges to the sufficiency of the Final EIS. *Cf. Highland Village Parents Group v. United States Fed. Highway Admin.*, 562 F. Supp. 2d 857, 864 (E.D. Tex. 2008) (finding that re-evaluation could not be used to raises issues that could have been raised as challenges to environmental assessment and finding of no significant impact).

13

1 agencies and ignored evidence that was contrary to the conclusions reached. *Id.*, 2011 WL
2 2650986, at *5-*6.

3 The court noted that "[w]hen an agency does not acknowledge contrary relevant
4 evidence that its own experts find, its analysis is arbitrary and capricious." *Id.*, 2011 WL
5 2650986, at *6. The plaintiffs in *Bair* also pointed out inconsistencies in the data analysis
6 Caltrans used in the EA, which the court concluded "might be found 'so implausible that it
7 could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* (quoting
8 *Lands Council*, 537 F.3d at 987). The plaintiffs' evidentiary showing also enabled the court to
9 evaluate the severity of the impact by reference to the factors set forth Section 1508.27(b). *See*
10 *Bair*, 2011 WL 2650986, at *7. Thus, the court concluded that the plaintiffs met their burden to
11 show serious questions that the defendant violated NEPA by failing to prepare an environmental
12 impact statement.

13 The Moving Plaintiffs argue that, as a result of the phasing, it will be necessary to haul
14 fill, divert streams, and drive piles twice. They contend that Caltrans failed to assess whether
15 any of the impacts resulting from those actions "would rise to the level of significant if repeated
16 or undertaken for a much longer period than initially planned." (Reply Br. at 6:9-10.) Caltrans
17 concurs that pile driving will be repeated in the second phase of construction, and there will be
18 additional construction activity during phase 2. (*See* Docket No. 65, Declaration of Jeff
19 Kozlowski ("Kozlowski Decl."), ¶ 15; Prabhala Decl., Ex. 3 (National Marine Fisheries Service
20 ("NMFS") Biological Opinion dated January 19, 2012 at 5-6).) However, in contrast to the
21 plaintiffs in *Bair*, the Moving Plaintiffs generally describe the impacts that Caltrans discussed in
22 the 2010 Re-Evaluation, and other documents, and assert in a conclusory fashion that these
23 impacts must be significant. They do not point this Court to any evidence that suggests
24 Caltrans' "offer[ed] an explanation" for its decision that ran "counter to the evidence before" it.
25 *Lands Council*, 537 F.3d at 987. Similarly, the Moving Plaintiffs have not pointed the Court to
26 anything in the record that could present serious questions that Caltrans' explanation for its
27 decision "is so implausible that it could not be ascribed to a difference in view or the product of
28 agency expertise." *Id.*

14

By way of example, the Moving Plaintiffs suggest that, as a result of phased construction, pile driving will adversely impact California Coastal Chinook salmon, Southern Oregon/Northern California Coasts coho salmon, and Northern California steelhead, all of which are recognized as "threatened" species. As discussed above, the Court evaluates "significance" in terms of context and intensity. One of the factors to consider in terms of intensity is "the *degree* to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973." 40 C.F.R. § 1508.127(b)(9). The Moving Plaintiffs do not proffer any argument as to the "degree" to which these species may be adversely impacted. In addition, *after* it decided to proceed in phases, Caltrans consulted with the NMFS to consider the impacts of phased construction on these species. The NMFS issued Biological Opinions in 2010 and 2012. In 2012, the NMFS concluded that "the proposed Willits Bypass Project is not likely to jeopardize the continued existence of" those species, and is "not likely to adversely modify or destroy designated critical habitat for" these species. (*See, e.g.,* Prabhala Decl., Ex. 3 (NFMS Biological Opinion at 75.) The Moving Plaintiffs fail to articulate how or why Caltrans' conclusion that a supplemental EIS was not required, in light of these opinions, was arbitrary or capricious.

**b.    Traffic Patterns.**

The Moving Plaintiffs also contend that changes in traffic flow undermine the traffic projections upon which Caltrans relied to determine a four-lane by-pass was necessary to satisfy the purpose and need of the Willits Bypass Project and, thus, Caltrans should be required to prepare a supplemental EIS that evaluates a two-lane alternative. In support of this argument, the Moving Plaintiffs rely on *Alaska Wilderness Recreation and Tourism Ass'n v. Morrison*, 67 F.3d 723 (9th Cir. 1995) ("*Alaska Wilderness*"). In the *Alaska Wilderness* case, the United States Forest Service ("Forest Service") cancelled a fifty-year contract for timber sales with a particular corporation and created a plan to offer timber that had been reserved for that corporation to others on an independent sales basis. As a result of that decision, certain constraints imposed in the contract were eliminated. 67 F.3d at 725-26. The plaintiffs argued

15

1    that "the contract significantly restricted the Forest Service's consideration of alternatives," and
2    when it was cancelled the Forest Service should have prepared a new EIS that expanded the
3    range of alternatives. *Id.* at 728. The Ninth Circuit agreed and held that "the cancellation of the
4    ... contract, which opened for consideration alternatives which *could not be freely reviewed*
5    when the ... contract was in force, is an event requiring serious and detailed evaluation by the
6    Forest Service." *Id.* at 730.

7    One of the stated purposes of the Willits Bypass Project is to achieve a minimum LOS
8    of "C" for inter-regional traffic. When Caltrans prepared the Draft EIS, it rejected a two-lane
9    alternative, because "a two-lane bypass would not achieve a satisfactory level of service or
10   improve safety." (Prabhala Decl., Ex. 1 (Draft EIS at S-6; *see id.* (in response to WEC's
11   request for reconsideration of two-lane alternative, "Caltrans analyzed the concept but chose not
12   to add a two-lane alternative because, foremost, a two-lane alternative would not meet the
13   'purpose and need' for the project"). The Moving Plaintiffs contend that Caltrans has implicitly
14   acknowledged that a two-lane alternative is a reasonable alternative and should be considered,
15   because it described the two-lane facility that will be constructed during the first phase as a
16   "functional interim facility."

17   In the 2006 Project Report, Caltrans discussed the possibility that phased construction
18   would be required. It also stated that the "first phase must be functional; *ie* [sic], the motoring
19   public should be able to drive on it upon opening the first phase to get from one place to
20   another." (2006 Report at 6-2.) This statement informs the meaning of Caltrans' statement that
21   the first phase of construction will provide a *functional* interim facility, and it undermines the
22   Moving Plaintiffs' suggestion that there are serious questions about whether Caltrans' implicitly
23   acknowledges that a two-lane bypass is a reasonable alternative in light of the stated purpose
24   and need. Further, although Caltrans acknowledges that there has been a short-term decline in
25   traffic volume, it argues that it must consider traffic volumes over the projected twenty-year
26   life-span of the Willits Bypass Project. (*See* Arseneau Decl., ¶¶ 8-9 ("[t]he recent traffic
27   volume decline ... does not change the fact that a four-lane bypass will still be required to meet
28   the project's purpose and need requirement of [LOS] C for the bypass segment"). Mr.

1 Estabrook contests the manner in which Caltrans calculated traffic growth and suggests that
2 Caltrans' long term growth figures also are inaccurate. (Estabrook Decl., ¶ 11.) However, Mr.
3 Arseneau attests that "[a] recent 2012 re-calculation of LOS for the bypass section has
4 confirmed that the Phase I two lane bypass segment will have LOS D until the additional lanes
5 are constructed by the second phase of the project which does not meet the projects Purpose and
6 Need requirements." (Arseneau Decl., ¶ 9.) Mr. Estabrook does not demonstrate whether, let
7 alone how, the purported changes in traffic growth impact the conclusion that a two-lane by-
8 pass would not provide an LOS of C, either in the short-term, as Mr. Arseneau attests, or over
9 the life of the Willits Bypass Project.

The Court concludes that the Moving Plaintiffs have not presented serious questions that the purported changes in traffic patterns require the preparation of a supplemental EIS.

### c. Mitigation and Monitoring Proposal.

Finally, the Moving Plaintiffs argue that a Mitigation and Monitoring Proposal ("MMP"), which Caltrans issued shows "new impacts" that "will result in significant new environmental impacts on farmland and environment of the Little Lake Valley as a whole and therefore justify preparation of a supplement[al] EIS prior to the construction of the" Willits Bypass Project. (Mot. at 17:19-21.) The Court finds that the Moving Plaintiffs' arguments about the MMP suffer from the same flaws as their arguments regarding the impacts of phasing. That is, the Moving Plaintiffs fail to point to evidence in the record from which the Court could conclude that serious questions exist to show Caltrans "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," when it determined that a supplemental EIS was not required. *Lands Council*, 537 F.3d at 987.

The Court recognizes that the administrative record has not yet been prepared. At the same time, at least two of the Moving Plaintiffs' declarants have participated in the planning relating to the Willits Bypass Project since 1988 and 1998, respectively. (Drell Decl., ¶ 3; Estabrook Decl., ¶ 3.) The Court does not prejudge what the Moving Plaintiffs might be able to

17

1  show once the record is fully developed. However, on the existing record, the Court concludes
2  that they have not met their burden to show either a likelihood of success on the merits of their
3  NEPA claim or that there are serious questions going to the merits of that claim.

   **3. Balance of Equities and Public Interest.**

5  The Court also has considered the balance of the equities and whether the public interest
6  favors an injunction. As the court stated in *Bair*, to balance the equities, the Court weighs "the
7  environmental risk were the preliminary injunction not granted ... against the economic loss or
8  other risk were the injunction granted, and the scale must tip sharply on the side of
9  environmental risk." *Bair*, 2011 WL 2650896, at *8. The Moving Plaintiffs argue the balance
10 of equities is in their favor because of the alleged environmental harms that will result if the
11 Willits Bypass Project proceeds without further evaluation. Counterbalanced against those
12 considerations are the fact that the Moving Plaintiffs did not file their motion until after
13 Caltrans had awarded the contract for the Willits Bypass Project.[14] That fact distinguishes this
14 case from the *Bair* case, in which the court concluded that the balance of equities favored the
15 plaintiffs, in part, because "[a]llowing Caltrans to proceed with advertising and securing bids
16 would constrain its ability to choose an alternative plan at a later date." *Bair*, 2011 WL
17 2650896, at *8. Finally, as stated, one of the stated purposes of the Willits Bypass Project is to
18 improve highway safety. (*See, e.g.*, Zazzeron Decl., Ex. B (Supplemental Environmental
19 Impact Report at A-5, A-6.) Although "preserving environmental resources is in the public's
20 interest," there are equivalent public interests on the other side of the scale, which counsel
21 against issuing an injunction. *Lands Council*, 537 F.3d at 1005.

22 Accordingly, the Court finds that the Moving Plaintiffs have not met their burden to
23 show the balance of equities tip sharply in their favor or that the public interest clearly favors
24 the issuance of an injunction.

---

[14] The Moving Plaintiffs argue that Caltrans awarded the contract in the face of pending litigation. However, they do not suggest that Caltrans lulled them into a false sense of security that a preliminary injunction would not be necessary. Indeed, the evidence that Moving Plaintiffs submits suggests that the Moving Plaintiffs knew by July that Caltrans intended to continue to move forward on the project. (Docket No. 72-3, Declaration of Adam Keats, ¶¶ 4-5.)

18

**CONCLUSION**

For the foregoing reasons, the Court DENIES the Moving Plaintiffs' motion for a preliminary injunction. The parties' case management statement is due on November 9, 2012, and they shall appear for the case management conference scheduled for November 16, 2012 at 1:30 p.m. The Court advises the parties that it will be unavailable from November 22, 2012 through November 30, 2012.

**IT IS SO ORDERED.**

Dated: November 1, 2012



JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE