United States District Court
Northern District of California

**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | Case No.  12-cv-02172-JSW |
| Plaintiffs, | **ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| v. | |
| CALIFORNIA DEPARTMENT OF TRANSPORTATION, et al., | Re: Dkt. Nos. 132, 135, 137 |
| Defendants. | |

**INTRODUCTION**

This matter comes before the Court upon consideration of Plaintiffs' Motion for Summary Judgment, filed by the Center for Biological Diversity ( "CBD"), the Sierra Club, the Willits Environmental Center ("WEC"), and the Environmental Protection Information Center ("EPIC") (collectively "Plaintiffs") (Docket No. 132, "Plaintiffs' MSJ"), as well as Defendants' Cross-Motions for Summary Judgment, filed by the California Department of Transportation and Malcolm Dougherty (collectively "Caltrans") (Docket No. 137, "Caltrans' Cross-MSJ") and the United States Army Corps of Engineers (the "Corps") (Docket No. 135, "Corps' Cross-MSJ").

The Court has considered the parties' papers, relevant legal authority, the record in this case, and had the benefit of oral argument.  The Court HEREBY DENIES Plaintiffs' Motion for Summary Judgment, GRANTS Caltrans' Cross-Motion for Summary Judgment, and GRANTS the Corps' Cross-Motion for Summary Judgment.

///

///

**BACKGROUND**

CBD, Sierra Club, and EPIC (the "NEPA Plaintiffs") allege that Caltrans failed to comply with the requirements of the National Environmental Policy Act, 42 U.S.C. Sections 4321, *et seq.* (the "NEPA Claim"). Plaintiffs allege that the Corps violated the Clean Water Act, 33 U.S.C. Sections 1251, *et seq.* (the "CWA Claim").[1]  Both claims arise out of the construction of a highway bypass project around the community of Willits, California (the "Willits Bypass Project"), the origin of which dates back to the mid-1950s. The parties agree that some form of a bypass is necessary. The crux of their dispute is whether the bypass should be composed of two lanes or four lanes.

In May 2002, Caltrans and the Federal Highway Administration ("FHWA")[2] issued a combined draft Environmental Impact Statement ("EIS") and Environmental Impact Report ("EIR") ("Draft EIS"). (*See* Caltrans' Administrative Record ("Caltrans AR") 12; Army Corps of Engineers' Administrative Record ("Corps AR") 18:2175-2742.)[3]  Caltrans and FHWA issued the Final EIS in October 2006. (*See* Caltrans AR 1-1928.)  In both the Draft EIS and the Final EIS, Caltrans considered variations of a four-lane freeway and a no-build alternative, but it also discussed the issue of a two-lane bypass.[4]  For example, in the Draft EIS it stated that:

> FHWA regulations do not allow development of a facility that would be functionally obsolete within its design life. In 1992, Caltrans staff studied a two-lane bypass of Willits and determined that a two-lane bypass would not achieve a satisfactory level of service or improve safety. In 2000, after all technical studies were completed for the current range of alternatives, [WEC] asked Caltrans to reconsider a two-lane alternative for the proposed bypass

---

[1]     On May 1, 2012, Plaintiffs filed the original complaint and, on June 25, 2012, filed the First Amended Complaint, which is the operative pleading.

[2]     The Court granted the FHWA's motion to dismiss on September 10, 2012. (Docket No. 58.)

[3]     Both Caltrans and the Corps have numbered the pages of their administrative records using six digits starting with "000001." The Court eliminates the preliminary "0s" when citing to the record, and it cites to Caltrans Administrative Record as follows: Caltrans' Administrative Record as "Caltrans AR page number." The Court cites to the Corps' Administrative Record as "Corps AR exhibit number:page number."

[4]     Since the inception of the Willits Bypass Project, Caltrans has considered approximately thirty different bypass alternatives. (Corps AR 16:1187, 16:1201-05.)

United States District Court
Northern District of California

project.  In response, Caltrans analyzed the concept but chose not to add a two-lane alternative because, foremost, a two-lane alternative would not meet the "purpose and need" for the project.  The "purpose and need" calls for a facility that would provide a LOS "C" through the 20-year design period (i.e., 2028).  A two-lane facility would provide a LOS "D" at peak hour upon construction (2008), and would diminish to LOS "E" within the 20-year period. LOS "E" exists when a facility is at capacity during peak traffic flows.  Thus, a new two-lane highway would be functionally obsolete within the design period.  This issue is discussed in detail in Section 3.6.2.

(Caltrans AR 1349.)

Caltrans also noted that "[i]t is important to recognize that a LOS of 'C' on a four-lane highway is substantially different than LOS 'C' on a two-lane highway, in that a freeway offers continuous passing opportunities.  On a 2-lane road, passing opportunities are affected by volume and sight distance.  Average operating speeds are directly affected by slower traffic."  (*Id.* 1349 n.2.)

Caltrans ultimately designated "Modified Alternative J1T" as the Least Environmentally Damaging Practicable Alternative ("LEDPA"). (Caltrans AR 16.)  The Corps agreed with that conclusion.  (*Id.*)  In the Final EIS, Caltrans again noted that many individuals and organizations argued that it should have considered a two-lane bypass.  Caltrans stated that it had analyzed the concept of a two-lane bypass, but it concluded that a two-lane bypass would not meet the purpose and need of the project.  (Caltrans AR 29; *see also* Corps AR 17:1577-1590.)  Caltrans also noted that "[u]pon environmental approval and appropriation of funding, [it] could design and construct all of the proposed project depending on funding availability.  In an effort to balance potential funding limitations and the need for the project," the Willits Bypass Project "could be constructed in phases, whereby a functional interim facility would be constructed initially…."  (Caltrans AR 37.)

In December 2006, Caltrans signed a Record of Decision ("ROD") for the Willits Bypass Project, approving Modified Alternative J1T.  (Caltrans AR 2000-2020.)  Plaintiffs did not file a legal challenge to that decision.  In 2007, Caltrans decided to proceed with phased construction, because of funding constraints.  During the first phase of the project, which is now under construction, Caltrans plans to complete a two-lane bypass, and it plans to complete the remaining

two lanes as funding becomes available.  (*See generally* Caltrans AR 23082; Corps AR 299:9521-9531.)

After it issued the FEIS and the ROD, Caltrans made several design changes to the Willits Bypass Project.  In June 2010, Caltrans prepared a re-evaluation to examine those changes and their potential environmental impacts (the "2010 Re-Evaluation").  (Caltrans AR 2215-2254; Corps AR 22:2868-2907.)  Caltrans specifically addressed the issue of phasing in the 2010 Re-Evaluation.  (Caltrans AR 2217.)  In June 2011, Caltrans prepared a second re-evaluation to evaluate impacts on Baker's Meadowfoam and farmlands (the "2011 Re-Evaluation").  (Caltrans AR 2509-2596; Corps AR 23:2908-2995.)  Caltrans specifically noted that phasing was one of the major changes that affected Baker's Meadowfoam habitat.  (Caltrans AR 2511.)  Ultimately, Caltrans concluded that the changes discussed in the 2010 and 2011 Re-Validations did not require it to issue a supplemental EIS.  (*Id.* 2215, 2509.)

It is undisputed that constructing the Willits Bypass Project will result in the discharge of fill material in designated wetlands and waters of the United States.  (Corps AR 305:9758-9764.)  Accordingly, on March 1, 2010, Caltrans applied for a permit pursuant to Section 404 of the CWA, and it submitted a Mitigation and Management Plan ("MMP").  (*See, e.g.,* Corps AR 7:452, 303:9601.)  The Corps initially rejected Caltrans' application, because "the Willits Bypass Project will result in alteration and/or destruction of wetlands to a magnitude that would contribute to significant degradation of waters of the United States."  (Corps AR 7:452.)  The Corps also rejected the initial MMP.  (Corps AR 303:9579.)  With respect to the Section 404 Permit application, the Corps noted that Caltrans planned to proceed in phases and concluded that "there are other practicable alternatives to the project with less adverse impact on the aquatic ecosystem or without other significant adverse environmental consequences."  (*Id.* 7:453; *see generally id.* 7:452-455.)

The Corps noted that it had "not exercised an option to re-open consideration of the project purpose and need.  However, [Caltrans'] pursuit of presenting a four lane bypass project to your funding partner that proposes a fill discharge for full project construction but only two lanes of roadway construction (without assurance that the other two lanes of roadway will be constructed),

United States District Court
Northern District of California

1  raises significant concerns regarding the extent of the public need for the project." (*Id.* 7:454.)

2  The Corps noted that it could be possible to obtain a Section 404 permit, if Caltrans' proposal

3  included specific revisions.  By way of example, the Corps noted that "[a] two-lane bypass was

4  last examined in 1992.  Several comments received in response to the Public Notice requested

5  updated traffic studies and questioned the overall project purpose and need.  The Corps requires

6  updated traffic studies and a reexamination of these factors to ensure the overall project purpose

7  and need are still current and valid." (*Id.*)

8      In January 2012, Caltrans submitted a revised MMP to the Corps.  (Corps AR 272:8644-

9  8965; *see also id.* 269:7500-8317 through 271:8452-8643, 273:8966-9028.)  In February 2012, the

10  Corps issued a Permit Evaluation and Decision Document (the "Section 404 Permit"), in which it

11  also evaluated information and circumstances that developed after Caltrans issued the Final EIS

12  and ROD.  (*Id.* 303:9575-9752.)  The Corps determined that a supplemental environmental

13  assessment ("EA"), rather than a supplemental EIS, was appropriate, because "the new

14  information presented did not rise to the level of significant impact on the human environment."

15  (*Id.* 303:9576.)  The Corps also found that Modified Alternative J1T was the LEDPA, and it

16  issued the Section 404 Permit with twenty-two special conditions.  (*Id.* 303:9611-9616.)

17      Pursuant to the Section 404 Permit, 51.07 acres of wetlands and other waters of the United

18  States can be permanently filled and 30.89 acres of wetlands and other waters of the United States

19  can be temporarily filled during construction of the Willits Bypass Project.  (*Id.* 305:9758-9764.)

20  Phase I construction "shall permanently fill 42.76 acres of waters of the United States and

21  temporarily fill 22.91 acres of waters of the United States.  … Phase II construction would

22  permanently fill 8.31 acres of waters of the United Sates and temporarily fill 8.07 acres of waters

23  of the United States." (*Id.* 305:9758.)  However, Caltrans "is not authorized to commence fill or

24  construction activities associated with Phase II of the [Willits Bypass] Project until after the Corps

25  has provided a written notice to proceed with Phase II." (*Id.* 303:9615.)  Caltrans will be required

26  to submit a proposed MMP for Phase II, which "must allow two (2) years of development and

27  review such that the final mitigation plan is developed prior to the start of Phase II construction."

28  (*Id.*)

1    On July 26, 2012, Caltrans selected a contractor for the Willits Bypass Project, and the

2    contractor began construction in January 2013.  (*See* Docket No. 138-1, Declaration of Mauricio

3    Serrano ("Serrano Decl."), ¶¶ 5-7.)

4    The Court shall address specific additional facts as necessary to the analysis in the

5    remainder of this Order.

6                                          **ANALYSIS**

7    **A.    Legal Standards Applicable to Motions for Summary Judgment.**

8    A principal purpose of the summary judgment procedure is to identify and dispose of

9    factually unsupported claims.  *Celotex v. Cattrett*, 477 U.S. 317, 323-24 (1986).  Summary

10   judgment is proper when "the movant shows that there is no genuine dispute as to any material

11   fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In

12   considering a motion for summary judgment, the court may not weigh the evidence or make

13   credibility determinations, and is required to draw all inferences in a light most favorable to the

14   non-moving party."  *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).  The party moving for

15   summary judgment bears the initial burden of identifying those portions of the pleadings,

16   discovery, and affidavits which demonstrate the absence of a genuine issue of material fact.

17   *Celotex*, 477 U.S. at 323; *see also* Fed. R. Civ. P. 56(c).

18   Once the moving party meets this initial burden, the non-moving party must go beyond the

19   pleadings and "identify with reasonable particularity the evidence that precludes summary

20   judgment."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined*

21   *Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995) (stating that it is not a district court's task to "scour the

22   record in search of a genuine issue of triable fact"); *see also* Fed. R. Civ. P. 56(e).  If the non-

23   moving party fails to make this showing, the moving party is entitled to judgment as a matter of

24   law.  *Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56(e)(3).

25   **B.    The NEPA Claim.**

26        **1.    NEPA Requirements.**

27   NEPA "establishes a 'national policy [to] encourage productive and enjoyable harmony

28   between man and his environment,' and was intended to reduce or eliminate environmental

United States District Court
Northern District of California

damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States." *Department of Transportation v. Public Citizen*, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321). NEPA does not mandate particular results. Rather "it imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Id.* (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-51 (1989)); *see also Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) ("*Blue Mountains*") ("NEPA ensures that the agency ... will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience.") (internal quotation marks and citation omitted). "NEPA merely prohibits uninformed - rather than unwise-agency action." *Robertson*, 490 U.S. at 351.

NEPA requires federal agencies to prepare a detailed EIS for all "'major Federal actions significantly affecting the quality of the human environment.'" *Blue Mountains*, 161 F.3d at 1211-12 (quoting 42 U.S.C. § 4332(2)(C)). "NEPA also imposes a continuing duty to supplement previous environmental documents." *Price Road Neighborhood Ass'n v. United States Dep't of Transportation*, 113 F.3d 1505, 1509 (9th Cir. 1997) (hereinafter "*Price Road*"). "[T]he decision whether to prepare a supplemental EIS is similar to the decision to prepare an EIS in the first instance: if there remains major Federal action to occur, and if ... new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." *Marsh*, 490 U.S. at 374 (internal quotations and brackets omitted).

Under regulations promulgated by the FHWA, a supplemental EIS is required where "changes to the proposed action would result in significant environmental impacts that were not evaluated in the EIS; or new information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts

United States District Court
Northern District of California

United States District Court
Northern District of California

1  not evaluated in the EIS." 23 C.F.R. § 771.130(a)(1)-(2).[5]  "Where the Administration is

2  uncertain of the significance of the new impacts, the applicant will develop appropriate

3  environmental studies or, if the Administration deems appropriate, an EA to assess the impacts of

4  the changes, new information, or new circumstances."  23 C.F.R. § 771.130(c).

5       The FHWA regulations also provide for re-evaluation of environmental documents.  23

6  C.F.R. § 771.129.  Those regulations provide, in relevant part, that "[a]fter approval of the ROD,

7  ... the applicant shall consult with the Administration prior to requesting any major federal

8  approvals or grants to establish whether or not the approved environmental document ... remains

9  valid for the requested Administration action."  *Id.* § 771.129(c).  In addition, the FHWA

10  regulations provide that "a supplemental EIS will not be necessary where: (1) the changes to the

11  proposed action, new information, or new circumstances result in a lessening of adverse

12  environmental impacts evaluated in the EIS without causing other environmental impacts that are

13  significant and were not evaluated in the EIS...."  *Id.* § 771.130(b)(1); *see also Price Road*, 113

14  F.3d at 1509-10.

15       Regulations promulgated by the CEQ, in turn, guide a court's review of an agency's

16  determination of "significance" and include two components: context and intensity.  *Blue*

17  *Mountains*, 161 F.3d at 1212; *see also Ocean Advocates v. United States Army Corps of*

18  *Engineers*, 402 F.3d 846, 865 (9th Cir. 2005) (citing 40 C.F.R. § 1508.27).  "Context refers to the

19  setting in which the proposed action takes place."  *Id.*; *see also* 40 C.F.R. § 1508.27(a) ("the

20  significance of an action must be analyzed in several contexts, such as society as a whole (human,

21  national), the affected region, the affected interests and the locality").  "Intensity means 'the

22  severity of the impact.'"  *Ocean Advocates*, 402 F.3d at 865 (quoting 40 C.F.R. § 1508.27(b)); *see*

23  *also* 40 C.F.R. § 1508.27(b)(1)-10 (setting forth factors to be considered when evaluating

24  intensity).

25

26  _____

[5]      This regulation is similar to regulations promulgated by the Council on Environmental

27  Quality ("CEQ"), which require an agency to prepare a supplemental EIS when it "makes
substantial changes in the proposed action that are relevant to environmental concerns; or ...

28  [t]here are significant new circumstances or information relevant to environmental concerns and
bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(i)-(ii).

1          **2.      Standard of Review.**

2          The NEPA Plaintiffs bring their claim pursuant to the Administrative Procedure Act (the

3   "APA"), which permits a court to "compel agency action unlawfully withheld or unreasonably

4   delayed," or to "hold unlawful and set aside agency action, findings and conclusions found to be -

5   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

6   §§ 706(1)-(2)(A).  Review of an agency's decision not to supplement an EIS is "controlled by the

7   'arbitrary and capricious' standard of" Section 706(2)(A).  *Marsh v. Oregon Natural Resources*

8   *Council*, 490 U.S. 360, 376 (1989); *see also Friends of the Clearwater v. Dombeck*, 222 F.3d 552,

9   556 (9th Cir. 2000) ("*Dombeck*") ("The Forest Service's decision to forego an SEIS should not be

10  set aside unless it was arbitrary or capricious.").  However, "[a]n action to compel an agency to

11  prepare a [supplemental EIS] … is not a challenge to a final agency decision, but rather an action

12  arising under 5 U.S.C. § 706(1)."  *Dombeck*, 222 F.3d at 560.

13         In their opening brief, the NEPA Plaintiffs argue that they are proceeding against Caltrans

14  under Section 706(1).  Caltrans argues in opposition that the NEPA Plaintiffs discuss why the

15  2010 and 2011 Re-Evaluations are inadequate, and it contends the NEPA Plaintiffs cannot

16  "circumvent the procedural bars to bringing a 706(2) action," which challenges those two

17  documents, by framing their claim under as a claim under Section 706(1).  In reply, the NEPA

18  Plaintiffs "hedg[e] their bets."  *Native Songbird Care and Conservation v. LaHood*, 2013 WL

19  335567, at *6 (N.D. Cal. July 2, 2013). [6]  Specifically, Plaintiffs argue that: (1) the 2010 and 2011

20  _____

21  [6]      This aspect of the parties' dispute first arose in connection with the NEPA Plaintiffs'
    motion for a preliminary injunction.  When it denied the NEPA Plaintiffs' motion, the Court

22  characterized the NEPA Claim as having been brought under Section 706(1), relying on *Dombeck*.
    *See Center for Biological Diversity v. California Dep't of Transportation*, 2012 WL 5383290, at

23  *8 n.12 (N.D. Cal. Nov. 1, 2012).  In *Dombeck*, the court concluded that even though the
    defendant had been presented with new information after it issued a final EIS, it "failed to timely

24  prepare, or even sufficiently to consider and evaluate the need for an SEIS," until after the
    plaintiffs filed suit.  Therefore, the court found it violated NEPA.  *Dombeck*, 222 F.3d at 558.

25  After the plaintiffs filed suit, the defendant prepared two supplemental information reports, which
    were the defendant's "formal instruments for documenting whether new information is sufficiently

26  significant to trigger the need for" a supplemental EIS.  *Id.* at 555.  That fact distinguishes this
    case from *Dombeck*, because Caltrans prepared the Re-Evaluation documents *before* the NEPA

27  Plaintiffs filed suit.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

Re-Evaluations are not final agency actions[7]; (2) if the 2010 and 2011 Re-Evaluations are final agency actions, the NEPA Plaintiffs have stated a timely claim under Section 706(2); and (3) if the Court rejects those arguments, it should grant the NEPA Plaintiffs leave to file a second amended complaint that pleads a claim that challenges those actions under Section 706(2).[8]

In the *Native Songbird* case, the plaintiffs, like the NEPA Plaintiffs here, argued that the defendants should have prepared a supplemental EIS, and they invoked both provisions of the APA to support that claim.  *See, e.g., Native Songbird*, 2013 WL 3355657 at *5.  The court explained why it viewed the plaintiffs' decision to do so to be prudent.  "When the agency has prepared a written determination that a court can review, the distinction between" Sections 706(1) and 706(2) "makes little difference.  Either the determination itself is a final agency action reviewable," under Section 706(2)(A), "or else the court reviews the [written determination] to determine whether the agency has 'unlawfully withheld' the preparation of a Supplemental EIS pursuant to" Section 706(1).  *Id.*, 2013 WL 3355657, at *6; *see also id.*, 2013 WL 3355657, at *6 n.6 (noting that "published authority on this issue generally demonstrates that in considering an agency's failure to prepare a Supplemental EIS, courts review a written determination or at least an expert determination").[9]

The Court finds that this is a case where the distinction between Sections 706(1) and

---

[7]     The NEPA Plaintiffs' current argument is not consistent with the position they advocated at the hearing on the motion for a preliminary injunction.  At that hearing, they argued that the 2011 Re-Validation was a final agency action and that they challenged its adequacy.

[8]     Both parties have "hedged their bets" in this case.  *Native Songbird*, 2013 WL 3355657, at *6.  On July 12, 2012, well after the 2010 and 2011 Re-Evaluations were issued and well after Plaintiffs filed the original complaint, the FHWA published a notice in the federal register announcing that Caltrans conducted the two Re-Evaluations and determined that preparation of a Supplemental EIS was not warranted.  According to this notice, those actions were deemed "final within the meaning of 23 U.S.C. 139(l)(1)."  (Caltrans AR 2618-2620.)

[9]     Indeed, in *Dombeck*, the Ninth Circuit stated that a claim to compel the preparation of a supplemental EIS is a claim under Section 706(1) in connection with plaintiffs' argument that the court should not have considered the defendant's post-litigation supplemental reports.  The Ninth Circuit rejected that argument, noting that, in Section 706(1) cases, "review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record."  *Id.*  Therefore, it was entitled to consider the supplemental reports, which it concluded supported the defendant's decision not to prepare a supplemental EIS.  *Id.* at 560-61.

1    706(2) is one without a difference.  Although the Court previously characterized the NEPA

2    Plaintiffs' claim as a "failure to act" claim arising under Section 706(1), it also is not a case where

3    Caltrans stood silent in the face of new information.  *See Center for Biodiversity*, 2012 WL

4    5383290, at *8.  Rather, Caltrans prepared the 2010 and 2011 Re-Evaluations and documented its

5    conclusion that a supplemental EIS was not required, as it is permitted to do.  *See Idaho Sporting*

6    *Congress v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000); *see also Price Road*, 113 F.3d at 1510.

7            Therefore, whether the Re-Evaluations are final agency actions or whether the Court must

8    review those documents to determine if Caltrans unlawfully withheld the preparation of a

9    supplemental EIS, the Court applies standard set forth *Marsh*:

10           [T]he … court "must consider whether the decision was based on a
         consideration of the relevant factors and whether there has been a
11           clear error of judgment."  This inquiry must be "searching and
         careful," but "the ultimate standard of review is a narrow one." …
12           When specialists express conflicting views, an agency must have
         discretion to rely on the reasonable opinions of its own qualified
13           experts even if, as an original matter, a court might find contrary
         views more persuasive. On the other hand, in the context of
14           reviewing a decision not to supplement an EIS, courts should not
         automatically defer to the agency's express reliance on an interest in
15           finality without carefully reviewing the record and satisfying
         themselves that the agency has made a reasoned decision based on
16           its evaluation of the significance - or lack of significance - of the
         new information.

17

18   *Marsh*, 490 U.S. at 378 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402,

19   416 (1971)).

20           Under this standard, a court "will reverse a decision as arbitrary and capricious only if the

21   agency relied on factors Congress did not intend it to consider, entirely failed to consider an

22   important aspect of the problem, or offered an explanation that runs counter to the evidence before

23   the agency or is so implausible that it could not be ascribed to a difference in view or the product

24   of agency expertise."  *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008), *overruled*

25   *on other grounds by Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008),

26   (internal quotations and citations omitted).[10]

27

28   _____

[10]        In light of this conclusion, the Court does not reach the issue of whether the 2010 and 2010
Re-Validations are "final agency actions."  Because the Court has reviewed these documents to

*United States District Court*
*Northern District of California*

11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**3.      Analysis.**

In support of their motion for summary judgment, the NEPA Plaintiffs argue that Caltrans is required to prepare a supplemental EIS, because phased construction and the changes in the design of the Willits Bypass Project will result in: (1) significant impacts to rare plants; (2) greater destruction of wetlands; (3) significant impacts to threatened species of fish and their habitats; and (4) significant impacts to agricultural land.

**a.      Rare Plants.**

The NEPA Plaintiffs argue that the changes to the Willits Bypass Project will result in greater impacts to two rare plants: Baker's Meadowfoam and North Coast semaphore grass.

**i.      Baker's Meadowfoam.**

It is undisputed that after Caltrans published the Final EIS, the impacts to Baker's Meadowfoam habitat increased.  (Caltrans AR 2240.)  According to the NEPA Plaintiffs, Baker's Meadowfoam is a "unique characteristic" of the area in which the Willits Bypass Project is located.  They argue that, because the impacts have increased, Caltrans was required to address this issue in a supplemental EIS.  One factor to consider when evaluating "intensity," is the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas."  40 C.F.R. § 1508.27(b)(3).

According to the 2011 Re-Evaluation, "[t]he ultimate 4-lane Willits Bypass project will … result in a total of 26.26 acres of permanent impacts, 31.16 acres of temporary impacts, and 58.78 acres of indirect impacts to" Baker's Meadowfoam habitat.  (*Id.* 2530.)[11]  Caltrans also acknowledged the fact that Baker's Meadowfoam has a limited population, and it considered that fact when it evaluated the potential impacts to both its observed habitat and areas of potential

determine whether the decision not to prepare a Supplemental EIS was arbitrary or capricious, the Court also does not reach the issue of whether it should grant the NEPA Plaintiffs leave to amend the FAC to include a direct challenge to each of those documents.  In addition, because the Court finds in favor of Caltrans on the merits of the NEPA Claim, it does not reach its arguments that the NEPA Plaintiffs' claims are barred by the doctrines of unclean hands and laches.

[11]      Caltrans addressed impacts to Baker's Meadowfoam in the Final EIS and in the 2010 and 2011 Re-Validation documents.  (*See, e.g.,* Caltrans AR 30, 65-68, 2219, 2228, 2231, 2510.)

12

1   habitat.  (*See, e.g., id.* 2538.)

2          The NEPA Plaintiffs argue that "the plant's few remaining habitats are 'stressed or in

3   decline,'" a statement made in the Technical Memo attached to the 2011 Re-Validation.  (See *id.*

4   2528-2565.)  That statement actually reads that "[i]t is *hypothesized* that many remaining

5   populations of Baker's Meadowfoam are stressed or in decline."  (*Id.* 2538 (emphasis added).)

6   The NEPA Plaintiffs do not put forth any evidence to suggest that this hypothesis is fact.  Caltrans

7   does acknowledge that, "[b]ecause of hydrologic alterations in Little Lake Valley, such as stream

8   diversions, impoundments, and conversion of wetlands to other uses, it is likely that the real extent

9   of habitat for [Baker's Meadowfoam] has been substantially reduced.  The primary threat to

10  Baker's [M]eadowfoam has been the conversion of habitat to various types of development.

11  Inappropriate grazing by livestock could also pose a threat to the remaining populations."  (*Id.*)

12         However, "it does not follow that the presence of some negative effects necessarily rises to

13  the level of demonstrating a significant effect on the environment."  *Native Ecosystems*, 428 F.3d

14  at 1240.  Although the impacts to number of acres of Baker's Meadowfoam have increased,

15  Caltrans stated the impacts were the same type of impacts that it previously analyzed and did "not

16  represent a major increase of impacts."  (Caltrans AR 2511.)  It also noted that the impacts would

17  be "fully mitigated by enhancing, preserving and restoring Baker's Meadowfoam within the

18  proposed mitigation parcels," which would result in a mitigation ratio of 5:1.  (*Id.*; *see also id.*

19  2522-23; 2528-2565 (Technical Memo Baker's Meadowfoam Impacts and Mitigation).)  The

20  NEPA Plaintiffs do not dispute that the type of impacts were the same.  They also have not

21  pointed to any evidence in the record that would contradict these conclusions or render them

22  implausible.

23         The NEPA Plaintiffs also argue that Caltrans should have prepared a supplemental EIS,

24  because, when it prepared the 2011 Re-Evaluation, Caltrans had not yet completed its mitigation

25  plan for Baker's Meadowfoam.  Contrary to the NEPA Plaintiffs' argument, Caltrans did not

26  ignore the issue of mitigation in the Final EIS or the 2010 and 2011 Re-Evaluation documents.

27  (*See, e.g., id.* 121-22, 2219, 2511-12.)  "There is a fundamental distinction … between a

28  requirement that mitigation be discussed in sufficient detail to ensure that environmental

United States District Court
Northern District of California

13

1    consequences have been fairly evaluated, on the one hand, and a substantive requirement that a

2    complete mitigation plan be actually formulated and adopted, on the other." *Robertson*, 490 U.S.

3    at 352.  Upon review of the record, the Court finds that Caltrans' decision to forego preparing a

4    supplemental EIS in light of new impacts to Baker's Meadowfoam was neither arbitrary nor

5    capricious.

6                                    ii.        **North Coast semaphore grass.**

7            The NEPA Plaintiffs also focus on alleged impacts to NCSG, which is listed as a

8    threatened species under California's Endangered Species Act and is a "federal species of

9    concern."[12]  (Caltrans AR 2107-2108, 2156.)  It is undisputed that Caltrans did not discuss impacts

10   on NCSG in the Final EIS, because it did not discover that the plant was located within the

11   footprint of the Willits Bypass Project until after it issued that document.  (*See id.*)  It also is

12   undisputed that, as a result of the discovery, Caltrans prepared a supplemental EIR under the

13   California Environmental Quality Act."  (Caltrans AR 2151; *see generally id.* 2147-2198.)

14           Although Plaintiffs argue that the Willits Bypass Project will affect 19% of NCSG habitat,

15   the record shows these figures pertain to one occurrence.  The record also shows that the Willits

16   Bypass Project will not affect most of the known occurrences of NCSG, and that the actual impact

17   would be to approximately 5.6% of the total occupied habitat.  Caltrans acknowledged that, "[i]n

18   the absence of mitigation, the loss of up to 5% of the occupied habitat (2,826 plants on 0.401 acre)

19   within NCSG's range potentially could have a substantial impact on the species**.**"  (*Id.* 2227.)

20   Caltrans then described the mitigation measures that would be implemented to address those

21   impacts, and it stated that the mitigation ratio would be approximately "12.7:1 (5.094 acres

22   preserved to approximately 0.401 acre affected)."  (*Id.*)  As a result of these mitigation efforts,

23   Caltrans concluded "the Willits Bypass Project will not affect NCSG's ability to survive and

24   reproduce and is not likely to result in jeopardy to the species."  (*Id.*)  The NEPA Plaintiffs do not

25   suggest that Caltrans' mitigation efforts would be ineffective, and they have not pointed to any

26

27   ──────────────────
     [12]        Although NCSG is a "federal species of concern," it is not an "endangered species or
28   threatened species ... that has been determined to be critical under the Endangered Species Act of
     1974. *See, e.g.,* 40 C.F.R. § 1508.27(9).

United States District Court
Northern District of California

1    evidence in the record that would render this explanation implausible.

2        The Court concludes that the record does not support a conclusion that Caltrans relied on

3    factors that Congress did not intend it to consider.  The Court also concludes that Caltrans'

4    explanation about why a Supplemental EIS was not required is not contradicted by the evidence

5    Caltrans had before it at the time it prepared the 2010 and 2011 Re-Evaluations or that its

6    explanations about why a Supplemental EIS was not warranted are "so implausible that it could

7    not be ascribed to a diffrence in view or the product of agency expertise."  *See Lands Council*, 537

8    F.3d at 987.

9            **b.    Wetlands.**

10       It is undisputed that changes to the Willits Bypass Project will result in additional impacts

11   to wetlands and other waters of the United States.  (*See, e.g.,* Caltrans AR 2240, 27389.)  One of

12   the factors to consider in evaluating whether an impact is significant is the "unique characteristics

13   of the geographic area such as proximity to … wetlands."  40 C.F.R. § 1508.27(b)(3).  All parties

14   acknowledge that some of these impacts will be temporary, although that does not necessarily

15   negate a finding of significance.  *Id.* § 1508.27(b)(7) ("Significance cannot be avoided by terming

16   an action temporary….").  The NEPA Plaintiffs again appear to take the position that *any*

17   additional impacts must be significant and, thus, Caltrans was required to prepare a Supplemental

18   EIS.  The Court is not persuaded.

19       Caltrans did not ignore the fact that the changes to the Willits Bypass Project would have

20   impacts on wetlands, and it documented the efforts that would be taken to minimize the impacts,

21   which include mitigation efforts.  (*See, e.g.,* Caltrans AR 2223-2224, 2229-2230.)  Although the

22   NEPA Plaintiffs may disagree with Caltrans' conclusion that the additional impacts were not

23   significant, they do not cite to any evidence that suggests Caltrans' "offer[ed] an explanation" for

24   its decision that ran "counter to the evidence before" it.  *Lands Council*, 537 F.3d at 987.

25   Similarly, they have not pointed the Court to anything in the record that suggests Caltrans'

26   explanation for its decision "is so implausible that it could not be ascribed to a difference in view

27   or the product of agency expertise."  *Id.*

28       On this record, the Court concludes that Caltrans' conclusion that the additional impacts to

United States District Court
Northern District of California

15

United States District Court
Northern District of California

1   wetlands did not give rise to the need for a Supplemental EIS was neither arbitrary nor capricious.

2      **c.**  **Impacts on species of fish and essential fish habitat.**

3      The NEPA Plaintiffs also argue that the design changes and phased construction will have

4   significant impacts on California Coastal Chinook Salmon ("CC Chinook Salmon"), Southern

5   Oregon/Northern California Coasts Coho Salmon ("SONCC Coho Salmon"), and Northern

6   California Steelhead ("NC Steelhead") that require Caltrans to prepare a Supplemental EIS.  They

7   also note that NMFS required Caltrans to re-initiate consultation under the ESA, which they

8   contend demonstrates that Caltrans should have prepared an EIS.

9      One factor to consider in terms of intensity is "the degree to which the action may

10  adversely affect an endangered or threatened species or its habitat that has been determined to be

11  critical under the Endangered Species Act of 1973."  40 C.F.R. § 1508.27(b)(9).  It is undisputed

12  that the CC Chinook Salmon, SONCC Coho Salmon, and the NC Steelhead are recognized as

13  "threatened" species under federal law.  It also is undisputed that various creeks within the

14  footprint of the Willits Bypass project are "designated critical habitat" for these species.  (*See, e.g.,*

15  Caltrans AR 2313.)

16     The NEPA Plaintiffs argue that, because NMFS stated that new impacts "may adversely

17  affect," these species and will adversely affect their habitat, Caltrans must prepare a Supplemental

18  EIS.  The NEPA Plaintiffs do not specify the "degree" to which these species may be adversely

19  impacted.  *See* 40 C.F.R. § 1508.27(b)(9).  In addition, after it decided to proceed in phases,

20  Caltrans consulted with the NMFS to consider the impacts of phased construction on these

21  species.  The NMFS issued Biological Opinions in 2010 and 2012.  In 2012, the NMFS concluded

22  that "the proposed Willits Bypass Project is not likely to jeopardize the continued existence of"

23  those species, and is "not likely to adversely modify or destroy designated critical habitat for"

24  these species.  (Caltrans AR 23079; *see generally id.* 23078-23178.)  The NEPA Plaintiffs fail to

25  articulate how or why, in light of these opinions, Caltrans' conclusion that a Supplemental EIS

26  was not required was arbitrary or capricious, and the Court finds it was not.

27     **d.**  **Agricultural Lands.**

28     Finally, the NEPA Plaintiffs argue that "significant new impacts to agricultural land have

16

been adopted without adequate supplemental environmental review." (Plaintiffs MSJ at 25:17-19.) As noted above, the term significantly "requires consideration of context and intensity." 40 C.F.R. § 1508.27. With a site-specific project such as the Willits Bypass Project, in evaluating context, "significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant." *Id.* § 1508.27(a). In addition, when evaluating intensity, one factor to consider is the "[u]nique characteristics of the geographic area such as proximity to … prime farmlands[.]" *Id.* § 1508.27(b)(3).

The NEPA Plaintiffs argue that the land management practices adopted as part of the mitigation efforts will cause a loss to farmlands and will decrease agricultural activities in the area. From that conclusion, the NEPA Plaintiffs presume that these changes were "significant" and argue that Caltrans should have prepared a Supplemental EIS. In the 2011 Re-Evaluation, Caltrans noted that "[w]ith the multiplier effect the economic effect of reduced cattle grazing from the wetland rehabilitation efforts in the October 2011 draft MMP are estimated at $300,000 annually." (Caltrans AR 2575.) As a result of mitigation requirements, Caltrans also noted that there would be a reduction in grazing on the mitigation parcels. However, none of those acres were designated as "Prime Farmland, Farmland of Statewide Importance, Unique Farmland, or Farmland of Local Importance," and none of those acres were being used for row crops. (*Id.* 2513-14.)[13]

Caltrans also stated that, when it issued the Final EIS, it had considered the impacts to farmlands and concluded that no significant impacts would occur. (*Id.* 2513.) Caltrans determined that "[c]urrent conclusions remain the same, even in view of the increases in agricultural land acquired for mitigation purposes and changes to the potential uses on a limited number of such parcels." (*Id.* 2513-14.) Caltrans also explained the bases for its conclusion. By way of example, it noted that:

---

[13]     The Court notes that the record also demonstrates that, during the Section 404 Permit process, the Corps considered direct and indirect impacts to prime and unique agricultural lands and food and fiber production, it noted that those impacts did "not rise to the level of significant, since the amount is a small fraction" of the total acreage and level of production within Mendocino County as a whole. (Corps AR 303:9592.) Plaintiffs did not challenge those conclusions in connection with their CWA Claim.

United States District Court
Northern District of California

[a]gricultural production will be limited only in the areas that will be receiving credits from [the Corps] for wetland mitigation. Pursuant to its responsibilities under CEQA and NEPA, Caltrans completed a Farmland Conversion Impact Rating for Corridor Type Projects form … for submittal to the [National Resource Conservation Service ("NRCS")]. The form uses a Land Evaluation and Site Assessment model (LESA) developed by the U.S. Soil Conservation Service and recognized by the California Resources Agency. The LESA provides lead agencies with a methodology to ensure that potentially significant effects on the environment of agricultural conversion are quantitatively and consistently considered in the environmental review process, including CEQA reviews. … The LESA evaluates measures of soil resource quality (representing potential farming practices as opposed to actual current uses), a given project's size, water resource availability, surrounding agricultural lands, and surrounding protected resource lands. For a given project, the factors are rated, weighted and combined, resulting in a numeric score. The LESA score becomes a basis for making a determination of the project's potential significance.

For the Willits Bypass Project, the NRCS completed parts IV, V, and VII of the form. As result of the combined assessment, the Willits Bypass Project (including the Ultimate Project alignment and mitigation) scored just under 147 points. According to the [Farmland Protection Policy Act ("FPPA")], sites receiving a total score of less than 160, need not be given further consideration for protection, and no additional sites need to be evaluated.

Since the submittal of the LESA to NRCS in May 2011, the amount of grazing to be eliminated has been *reduced from nearly 1,000 acres to roughly 500*. The LESA score would be reduced commensurately.

(*Id.* 2513 (emphasis added).)

The NEPA Plaintiffs do not suggest that, in reaching this conclusion, Caltrans relied on impermissible factors. Nor do they suggest that the LESA model is flawed, either in general or as it was applied to the Willits Bypass Project or that Caltrans' conclusion were contrary to the actual evidence before it.

### 4.     Conclusion on NEPA Claim.

It is clear that "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized." *Marsh*, 490 U.S. at 373. Rather, the duty to prepare a supplemental EIS arises only when there are changes to a project or new information which result in environmental impacts that "reach a certain threshold," *i.e.,* they are significant or uncertain. *Price Road*, 116 F.3d at 1509. It also is clear that NEPA requires agencies "to take a 'hard look'

at the environmental effects of their planned action, even after a proposal has received initial approval." *Marsh*, 490 U.S. at 374.  The Court has carefully considered the Administrative Record, and it concludes that Caltrans took the requisite hard look at the changes to the Willits Bypass Project and the information that developed after it issued the Final EIS.

Accordingly, the Court concludes that Caltrans decision not to prepare an EIS was neither arbitrary nor capricious and it DENIES the NEPA Plaintiffs' motion for summary judgment, and GRANTS Caltrans' cross-motion for summary judgment.

## C.     The CWA Claim.

### 1.     CWA Requirements.

The objective of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  The CWA generally prohibits the discharge of dredged or fill materials into the waters of the United States, which include wetlands, except as in compliance with the CWA.  *Id.* §§ 1311(a), 1362(6)-(7); 33 C.F.R. § 328.3(a)-(b).  However, the CWA allows the Secretary of the Army to "issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites" (hereinafter a "Section 404 permit"), in compliance with regulations promulgated by the Corps and guidelines promulgated by the Corps and the Environmental Protection Agency.  33 U.S.C. § 1344; *see also* 33 C.F.R. §§ 320.1, *et seq.*; 40 C.F.R. §§ 230.1, *et seq.*  The Corps must observe "'[b]oth sets of rules,'" when it considers an application for a Section 404 permit.  *Bering Strait Citizens for Responsible Resource Development v. United States Army Corps of Engineers*, 524 F.3d 938, 947 (9th Cir. 2008) (quoting *Friends of the Earth v. Hintz*, 800 F.2d 822, 829 (9th Cir. 1986)).

> The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest. Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in a particular case.  The benefits which may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments.  The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process.  That decision should

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

reflect the national concern for both protection and utilization of important resources. All factors which may be relevant to the proposal must be considered including the cumulative effects thereof[.] … For activities involving 404 discharges, a permit will be denied if the discharge that would be authorized by such permit would not comply with [EPA guidelines.]  Subject to the preceding sentence and any other applicable guidelines and criteria (see [sections] 302.2 and 320.3), a permit will be granted unless the district engineer determines that it would be contrary to the public interest.

6    33 C.F.R. § 320.4(a)(1).

7        The regulations and guidelines provide that "[n]o discharge of dredged or fill material shall

8    be permitted if there is a practicable alternative to the proposed discharge which would have less

9    adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant

10   adverse environmental consequences." 40 C.F.R. § 230.10(a); *see also Bering Strait*, 524 F.3d at

11   947.  "'In evaluating whether a given alternative site is practicable, the Corps may legitimately

12   consider such facts as cost to the applicant and logistics.  In addition, the Corps has a duty to

13   consider the applicant's purpose.'"  *Bering Strait*, 524 F.3d at 947 (quoting *Sylvester v. United*

14   *States Army Corps of Engineers*, 882 F.2d 407, 409 (9th Cir. 1989)); *see also* 40 C.F.R. §

15   230.10(a)(2).

16       The guidelines also provide that "no discharge of dredged or fill material shall be permitted

17   which will cause or contribute to significant degradation of the waters of the United States,"

18   including "significantly adverse effects of the pollutants on human health or welfare, … aquatic

19   life and other wildlife dependent on aquatic ecosystems, … aquatic ecosystem diversity, … or

20   recreational, aesthetic, and economic values."  40 C.F.R. § 230.10(c)(1)-(4).  Further, "no

21   discharge of dredged or fill material shall be permitted unless appropriate and practicable steps

22   have been taken which will minimize potential adverse impacts of the discharge on the aquatic

23   ecosystem." *Id.* § 230.10(d.)  Finally, "[m]itigation is an important aspect of the review and

24   balancing process on many … permit applications.  Consideration of mitigation will occur

25   throughout the permit application review process and includes avoiding, minimizing, rectifying,

26   reducing, or compensating for resource losses…."  33 C.F.R. § 320.4(r)(1); *see also id.* §

27   325.4(a)(3) (Corps may condition issuance of permit on mitigation.).

28   ///

United States District Court
Northern District of California

1         **2.**      **Standard of Review.**

2         Unlike the NEPA Plaintiffs' claim, it is clear that the CWA claim is a challenge to a final

3 agency action, specifically the decision to issue the Section 404 Permit.  Accordingly, the Court

4 analyzes this claim under the arbitrary and capricious standard.  5 U.S.C. § 706(2).  The Court will

5 overturn the Corps' decision only if the Corps "relied on factors Congress did not intend it to

6 consider, entirely failed to consider an important aspect of the problem, or offered an explanation

7 that runs counter to the evidence before the agency or is so implausible that it could not be

8 ascribed to a difference in view or the product of agency expertise."  *Lands Council*, 537 F.3d at

9 987.

10         **3.**      **Analysis.**

11         It is undisputed that: (1) the wetlands in the Willits Bypass Project area qualify as

12 "navigable waters" under the CWA; (2) the project is not "water dependent;" (3) the Willits

13 Bypass Project will involve the discharge of dredged or fill materials into those waters; and (4)

14 that a Section 404(a) Permit is required.  Plaintiffs argue that the Corps violated the CWA when it

15 approved the Section 404(a) Permit, because it: (1) improperly rejected less damaging practicable

16 alternatives; (2) failed to independently select the LEDPA; and (3) relied on and approved an

17 inadequate and incomplete MMP.

18         **a.**      **Improper rejection of less damaging practicable alternatives.**

19         Plaintiffs argue that the Corps improperly conflated the "purpose and need" requirements

20 of NEPA with the CWA's requirement to consider the "overall project purposes."  *Compare* 40

21 C.F.R. § 230.10(a)(2) *with* 40 C.F.R. § 1502.13; 33 C.F.R. § 325, App. B, ¶ 9(b)(4).  In its

22 decision to grant the Section 404 Permit, the Corps stated that "[t]he overall project purpose is to

23 reduce traffic congestion and increase pedestrian safety" and it concluded that Modified

24 Alternative JIT was the LEDPA.  The Corps also considered Caltrans' view that a "minimum level

25 of LOS C" was required to fulfill the Willits Bypass Project's purpose and need.  (*See* Corps AR

26 at 24:2998, 303:9581.)  Plaintiffs argue that this decision was arbitrary and capricious, because

27 two-lane alternatives would have satisfied the overall project purpose.

28         The Corps did accept Caltrans view of the purpose and need for the Willits Bypass Project.

1   However, there is nothing inherently improper in that conclusion, *i.e.* the Corps was not relying on

2   factors that Congress did not intend it to consider.  *See, e.g., Butte Environmental Council v.*

3   *United States Army Corps of Engineers*, 620 F.3d 936 (9th Cir. 2010).  In *Butte Environmental*

4   *Council*, the plaintiff challenged the decision to grant a Section 404 permit for a proposed business

5   park to the city of Redding ("the City").  The plaintiff argued that the Corps acted arbitrarily and

6   capriciously by deferring to the City's judgment that it required a site large enough to

7   accommodate at least one 100-acre parcel.  The Ninth Circuit rejected this argument.

8         Far from blindly accepting the project's stated purpose, the Corps
   initially expressed skepticism that the City needed a site large
9   enough to accommodate a 100-acre parcel[.]  In response, the City
   revised its EIS to clarify that "a medium to large parcel business
10   park" was necessary to meet the manufacturing and distribution
   needs of interested business-park users and to create the desired
11   "synergy" among the park's occupants.  It is true that the Corps
   ultimately accepted the City's revised statement of purpose and
12   conducted its analysis in light of it.  But "the Corps has a duty to
   consider the *applicant*'s purpose," where, as here, that purpose is
13   "genuine and legitimate."

14   *Id.* at 946 (quoting *Sylvester*, 882 F.2d at 409) (emphasis added).

15       In this case, as in *Butte Council*, when phased construction became a reality, the Corps did

16   not blindly accept that Modified Alternative JIT remained the LEDPA.  Rather, the Corps rejected

17   Caltrans' initial application for a Section 404 Permit.  It specifically cited phased construction and

18   stated that it "conclude[d] there are other practicable alternatives to the [Willits Bypass Project]

19   with less adverse impact on the aquatic ecosystem or without other significant adverse

20   environmental impacts."  (Corps AR 7:453; *see also id.* 7:452-453 (rejecting application because

21   "the Willits Bypass Project will result in alteration and/or destruction of wetlands to a magnitude

22   that would contribute to significant degradation of waters of the United States," and because "the

23   proposed MMP does not provide the necessary assurances to allow the Corps to determine the

24   proposed MMP will be adequate, self-sustaining, or feasible enough to replace the wetlands

25   functions lost to project construction").)

26       The Corps then advised Caltrans it could possibly issue a permit if certain revisions were

27   made.  It set forth five conditions that, at a minimum, Caltrans would be required to address in a

28   revised application, including updated traffic studies to support the purpose and need of the

United States District Court
Northern District of California

22

project.  (*Id.* 7:453-454.)  After it considered the revised traffic studies, the Corps accepted Caltrans' conclusion that a minimum level service of LOS C was required.  Although Plaintiffs disagree with this conclusion, they do not point to anything in the record to suggest that Caltrans' stated "purpose and need" was not genuine or legitimate.  Thus, the Corps had a duty to consider that purpose.  *Butte County*, 620 F.3d at 946.

Furthermore, Caltrans maintained that part of the purpose and need for the Willits Bypass Project was to construct a bypass that "would provide at least [an LOS C] through the 20-year design period (i.e. 2028).  A two-lane facility would provide a LOS 'D' at peak hour upon construction and throughout the 20-year design period."  (Corps AR 16:889; *see also id.* 16:897, 17:1581 (noting that a two-lane facility would be "functionally obsolete within 20 year design period"; 303:9581 (noting that even with updated traffic studies, a two-lane bypass would only provide LOS D).)  Based on this record, the Court cannot say an LOS C level of service was incidental to the Willits Bypass Project.  *See, e.g., Sylvester*, 882 F.2d at 409 (noting that an alternative site for project did "not have to accommodate components … that are merely incidental to the applicant's *basic* purpose") (emphasis in original).

The Corps relied on factors that it was entitled to and required to consider.  After carefully evaluating the other alternatives, the Corps concluded that Modified Alternative JT1 remained the LEPDA.  The Court finds that decision was neither arbitrary nor capricious.

**b.      Failure to independently select the LEDPA.**

Plaintiffs also argue that the Corps failed to independently select the LEDPA, relying on a series of letters that Caltrans sent to the Corps in January and February of 2012, in response to the Corps' request for additional information on traffic patterns.  (*See* Corps AR 215:4882-4916, 394:10416, 301:9568-9570, 395:10417-419.)  Plaintiffs argue that these letters provide contradictory information about whether traffic patterns had increased or decreased over specific periods and include unsupported information about whether or not local traffic would utilize the Willits Bypass Project.  Plaintiffs further argue Corps should have requested additional information from Caltrans about these studies.  The Court does not find Plaintiffs' arguments persuasive.

23

1      When it initially rejected Caltrans' Section 404 Permit application, the Corps stated that it

2  would "require[] updated traffic studies."  (Corps AR 7:454.)  It is not clear from the record that

3  Caltrans' information on updated studies on traffic patterns and usage are "directly contradictory,"

4  such that it would have raised a red flag that might have required the Corps to request further

5  information.  Caltrans also advised the Corps that it had "modeled and analyzed" a "two-lane,

6  controlled access, at-grade Willits Bypass Alternative (modified JT-1 [*sic*])," and that it used the

7  Highway Capacity Manual published by the Transportation Research Board of the National

8  Academies ("HCM") to analyze the "proposed signalized intersections, … as well as the mainline

9  segment."  (*Id.* 394:10416; *see also id.* 301:9569.)  Caltrans noted that, although there had been

10  some "decrease in peak hour traffic along US 101 over the previous twelve years[,] … [u]sing the

11  current lower traffic volumes" the intersections operated at an LOS C and the mainline operated at

12  an LOS D, "regardless of striping."  (*Id.* 394:10416)

13      Caltrans later clarified that the HCM relies on the "mainline" level of service to determine

14  "the number of lanes that are required to be built for streets or highways," that Caltrans had used

15  Highway Capacity Software ("HCS") to determine the mainline level of service, and that HCS is

16  "widely used in the traffic engineering industry for level of service calculation."  (*Id.* 301:9569.)

17  Caltrans also advised the Corps that, even with a reduction in traffic volume in the short term, the

18  mainline of the Willits Bypass Project would operate only at an LOS D, which was why a two-

19  lane option was not sufficient.  (*Id.* 301:9568-70.)  Plaintiffs have not questioned the validity of, or

20  the propriety of Caltrans' reliance on, the HCM or HCS.

21      As discussed above, Caltrans has maintained consistently that it must be able to maintain a

22  minimum LOS Cover the 20 year design period of the Willits Bypass Project.  (*See, e.g., id.*

23  (16:889, 16:897, 17:1581, 215:4894, 303:9581.)  In response to comments about the traffic

24  studies, Caltrans noted the "short-term decline in traffic on US 101" and stated that "[t]he current

25  economic recession has affected traffic levels throughout the country."  (*Id.* 303:9658.)  Caltrans

26  also cited research that indicated this trend was beginning to reverse in urban areas, and that rural

27  areas tend to "lag behind when it comes to economic recovery."  Caltrans also cited studies that

28  suggested the population in the vicinity of the Willits Bypass Project would grow.  (*Id.* 303:9658-

United States District Court
Northern District of California

24

59.)  Thus, notwithstanding a short-term decrease in traffic volume, Caltrans offered the Corps information that suggested traffic volume would increase over the 20 year design period. Plaintiffs may disagree with these studies, but they do not point Court to any evidence in the record that contradicts the studies upon which Caltrans relied.  Thus, they do not point the Court to any evidence that suggests that the Corps' decision to grant the Section 404 Permit was contrary to the evidence it had before it.

In responding to the Corps' concerns, Caltrans also concluded that the Willits Bypass Project would require four lanes, rather than two, because local traffic would use the Willits Bypass Project to "get around town."  (*See id.* 395:10417-10418.)  Plaintiffs argue that this conclusion is not supported.  However, Caltrans explained its rationale for this conclusion:

> The methodology used to generate the estimated numbers of bypass users are based on well-established rules used in modeling.  The primary rule is the concept of "least cost."  When all other factors are equal a driver will follow a path of least cost.  In traffic modeling, least cost equates to time savings.  Intuitively it makes perfect sense when a driver is given two options to reach a destination (on takes more time and one takes less) the driver will choose the one that takes less time even if it requires traveling further in distance.

(*Id.* 303:9658-59.)

Plaintiffs may argue that Caltrans' analogy to more urbanized areas is flawed, but they do not point to anything in the record to contradict Caltrans' reliance on the "least cost" principle.  In sum, Plaintiffs have not pointed to anything in the record that would suggest that the Corps' conclusions regarding Caltrans' updated traffic studies ran contrary to the evidence before it or are so implausible that they could not be ascribed to a difference in view or the product of agency expertise.  *Lands Council*, 537 F.3d at 987.

The Court concludes the Corps did not arbitrarily and capriciously conclude that Modified Alternative J1T was the LEDPA.

### c.     Mitigation and Monitoring Plan.

Finally, Plaintiffs argue that the MMP is missing information and fails to analyze mitigation for the second phase of the Willits Bypass Project.

United States District Court
Northern District of California

i.      **Missing information.**

Plaintiffs argue that the MMP lacks information on flood control and treatment of the flood plain, construction related temporary impacts, and grazing on mitigation parcels.  The Corps is "required to develop … proposed mitigation measures 'to a reasonable degree,'" and is "not required to develop a complete mitigation plan detailing the 'precise nature … of the mitigation measures[.]'" *Tillamook County v. United States Army Corps of Engineers*, 288 F.3d 1140, 1144 (9th Cir. 2002) (quoting *Wetlands Action Network v. United States Army Corps of Engineers*, 222 F.3d 1105, 1121 (9th Cir. 2000), *abrogated on other grounds by Wilderness Society v. United States Forest Service*, 630 F.3d 1173 (9th Cir. 2011)).  The Corps also is not required to "'completely compensate for adverse environmental impacts.'" *Id.* (quoting *Wetlands Action Network*, 222 F.3d at 1121).

The MMP contains a statement that wetlands in the vicinity of the Willits Bypass Project function to attenuate "floodflow" and describes the history of flooding in the area as well as the factors that contribute to flooding.  (Corps AR 303:8663-8664, 8717-8718, 8724-8725.)  To address that issue, the MMP provides for, *inter alia*, establishing vegetated wetlands "in riparian habitat established adjacent to stream channels."  (*Id.* 303:8693; *see also id.* 303:8698 (noting that rehabilitation as mitigation measure will "enhance wetlands through increase in biomass," which will "decrease water velocity during high-flow events")).)  The MMP also contains detailed information about the overall mitigation plan, a plan for each mitigation parcel of land, and the reasons a certain type of mitigation was chosen for those parcels.  (*See, e.g.,* Corps AR 272:8816-8895.)

Plaintiffs do not challenge those mitigation efforts.  Rather, they focus on the fact that Caltrans stated that "there may be a need to address sedimentation accumulation in streams such as Outlet and Davis Creek if it … threatens to induce flooding of a neighboring property."  (Corps AR 303:9710 (response to comments on "concern regarding resolution if conflict occurs between neighboring parcels managed for agriculture and wetlands")).)  After acknowledging this fact, Caltrans stated that it "has added a section in the adaptive management chapter that will allow the land manager the flexibility to work with the stakeholder regulatory agencies to perform

26

United States District Court
Northern District of California

1    maintenance on the streams if needed." (*Id.*; *see also id.* 272:8936-8937 (discussing changes in

2    hydrology, including flooding, that might require adaptive management and type of actions that

3    would be taken).)

4          The adaptive management chapter of the MMP describes what type of actions will be taken

5    in the event of flooding in the mitigation areas and notes that "where it is clear that an action taken

6    by the land manager … in order to comply with the mitigation commitments threatens to flood a

7    neighboring property, immediate action will be taken to prevent such flooding." (*Id.* 272:8949.)

8    In addition, the MMP contains erosion schedules, and Plaintiffs do not challenge the figures and

9    information set forth in those schedules. (*Id.* 270:8410-8416.)  The record shows that the Corps

10   has made a genuine effort to develop a detailed mitigation plan, and "the mere fact that one aspect

11   of the plan is not yet finalized [does not] lead to the conclusion that the Corps' decision was

12   arbitrary and capricious." *Bering Strait*, 524 F.3d at 950-51.

13         Plaintiffs also argue that the MMP lacks information and analysis about construction

14   related impacts.  However, the MMP contains information about which construction-related

15   impacts would be considered permanent and which construction-related impacts were temporary,

16   *i.e.* "areas that are filled temporarily during construction." (Corps AR 272:8678.)  In addition, the

17   MMP states that in order to monitor groundwater, wells were installed "in wet meadows in the

18   haul road alignment to determine whether project impacts from the haul roads would be

19   temporary, as expected, or permanent." (*Id.* 272:8730.)  The MMP also requires Caltrans and its

20   contractor to use Best Management Practices during construction.  Although Plaintiffs argue that

21   the Corps should not have deferred to Caltrans' reliance on the BMPs, Plaintiffs do not challenge

22   the validity of those practices.  (*See id.* 8691-92, 8875-76.)

23         Finally, with respect to grazing, there are approximately 2000 acres of land subject to

24   mitigation, 400 of which are covered by the MMP.  Plaintiffs argue that the Corps should not have

25   approved the MMP until the State mitigation plan for the remaining 1600 acres was complete.

26   "Processing of an application for a [Section 404] permit normally will proceed concurrently with

27   the processing of other required Federal, state, and/or local authorizations or certifications.  Final

28   action on the … permit will not normally be delayed pending action by another Federal, state or

27

United States District Court
Northern District of California

1   local agency." 33 C.F.R. § 320.4(j)(1); *see also Robertson*, 490 U.S. at 352-53 (noting that it

2   would be incongruous to conclude that a federal agency "has not power to act until the local

3   agencies have reached a final conclusion on what mitigating measures they consider necessary").

4        The Court concludes that the MMP is reasonably developed as to the grazing issues and

5   concludes that the Corps' decision to issue the Section 404(b) permit in the absence of final

6   grazing plan from the State was neither arbitrary nor capricious.

7                      **ii.**       **Failure to analyze mitigation for Phase II.**

8        It is undisputed that the MMP does not include mitigation for Phase II of the Willits

9   Bypass Project. However, the Section 404 Permit includes a special condition regarding Phase II,

10  which provides as follows:

> 11 The Permittee (Caltrans) is not authorized to commence fill or
> 12 construction activities associated with Phase II of the Project until
>    after the Corps has provided a written notice to proceed with Phase
> 13 II. Design-level drawings for Phase II shall be submitted to the
>    Corps a minimum of two years prior to the anticipated
> 14 commencement of construction. In addition, a draft mitigation plan
>    in accordance with the requirements of 33 C.F.R. § 332.4(c) must be
> 15 submitted to the Corps to address Phase II project impacts. The
>    draft submittal must allow two (2) years of development and review
> 16 such that the final mitigation plan is developed prior to the proposed
>    start of Phase II construction. The draft mitigation plan shall
> 17 address the 8.31 acres of permanent and 8.07 acres of temporary
>    impacts to waters of the U.S. associated with Phase II through
> 18 restoration/establishment/enhancement of waters of the U.S. and
>    shall ensure that there will not be a net loss of aquatic resource
>    functions and services resulting from Phase II. The Phase II final
> 19 mitigation plan will be submitted for public review and comment via
>    Public Notice, and the Permittee shall adequately respond to all
> 20 comments prior to Corps approval of the plan. No work in waters of
>    the U.S. associated with Phase II is authorized until the Permittee
> 21 receives, in writing, Corps approval of the final mitigation plan and
>    Corps acknowledgement of the receipt of the Phase II design-level
> 22 drawings. The Permittee shall fully implement this Phase II final
>    mitigation plan concurrently with, or prior to, Phase II impacts to
> 23 waters of the U.S.

24       Although the MMP does not include mitigation for Phase II, when it prepared the MMP,

25  Caltrans calculated the total number of acres that would be permanently and temporarily impacted

26  by the "ultimate four-lane project." (Corps AR 272:8679.) The Corps also did not ignore the fact

27  of phased construction or its impacts. (*See, e.g.,* Corps AR 303:9576-9577, 9581.) "That the

28  Corps intends to pursue additional mitigation opportunities at a later time does not conflict with

the requirement of the CWA unless the mitigation measures that have been fully developed are inadequate." *Bering Strait*, 524 F.3d at 951.  For the reasons discussed in the preceding section, the Court cannot say that the mitigation measures that have been fully developed are inadequate. As such, the Court concludes that the Corps' decision to develop mitigation measures for Phase II of the Willits Bypass Project at a later time was neither arbitrary nor capricious.

    **4.**        **Conclusion on CWA Claim.**

       The Court has carefully considered the Administrative Record, and it concludes that the Corps' decision to grant the Section 404 Permit was neither arbitrary nor capricious, and it DENIES Plaintiffs' motion for summary judgment, and GRANTS the Corps' cross-motion for summary judgment.

       The Court shall enter a separate judgment, and the Clerk shall close the file.

       **IT IS SO ORDERED**.

Dated: December 19, 2013

_____
JEFFREY S. WHITE
United States District Judge

29